**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THE BURLINGTON INSURANCE COMPANY
and STONEBRIDGE, INC,

                             Plaintiffs,

     v.

    NORTHLAND INSURANCE COMPANY,

                       Defendant.

Civ. No. 09-3209(DRD)

**O P I N I O N**

*Appearances by:*

WADE CLARK MULCAHY
by:    Denise Fontana Ricci, Esq.,
917 Mountain Avenue
Mountainside, NJ 07092

     *Attorney for Plaintiffs*


BOROWSKY & BOROWSKY, LLC
by:    Frank E. Borowsky, Jr., Esq.
          Erin M. McDevitt-Frantz, Esq.
59 Avenue at the Common, Suite 101 & 102
Shrewsbury, NJ 07701

     *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This matter concerns an insurance coverage dispute arising out of an accident that occurred at a construction site while workers were unloading a truck. Plaintiffs, The Burlington Insurance Company ("Burlington"), a general liability insurer and Stonebridge, Inc. ("Stonebridge"), a construction company, instituted this suit against Defendant, Northland Insurance Company ("Northland"), an auto insurance provider. Plaintiffs seek: (1) a declaration that Northland owes primary coverage to Stonebridge in connection with Laise v. Stonebridge, Inc., Docket No. MID-L7986-07 (Middlesex County Superior Court) (the "Laise action"); (2) a declaration that Northland owes a defense and indemnification to Stonebridge for the same; and (3) reimbursement of defense costs incurred in defending and settling the Laise matter.

Presently before the court are motions for summary judgment filed by both Plaintiffs and Defendant. For the reasons set forth below, Plaintiffs' motion is GRANTED. Defendant's motion is DENIED.

## I.      BACKGROUND

Plaintiff Stonebridge is a construction company, and Plaintiff Burlington is its general liability insurer. Defendant Northland is an auto insurance provider. This matter is an insurance coverage dispute arising out of an unloading accident that occurred at a construction site run by Stonebridge involving a truck insured by Northland.

The underlying facts concerning the accident are largely undisputed. On June 6, 2006, Bruce Laise, a truck driver and Pennsylvania resident, drove a tractor and flatbed trailer from a lot in Milton, Pennsylvania to a construction site in Paramus, New Jersey. (Def. SOF. ¶¶ 1-3). The truck was loaded with steel bar joists, which Laise was assigned to deliver to the site. Id. at

¶ 3. At the site, located at the Garden City Plaza, Stonebridge was performing work under a steel erection subcontract that it had entered with Weir Welding, Inc. ("Weir"). Id.

Upon arrival, a Stonebridge Foreman instructed Laise to park the truck so that it could be unloaded. Id. at ¶ 4. Laise parked the truck where directed, exited the vehicle and began to unstrap the load. Id. at ¶ 5. While Laise was unstrapping the cargo, an ironworker employed by Stonebridge climbed onto the trailer to put "choker slings" through the steel bar joists so that they could be lifted from the trailer bed. (Pl. Ex. 5, 16:24-25). The employee dropped a choker near Laise, who picked it up and handed it up to the employee. Id. at 23:8-16. As the employee bent to retrieve the choker, a wrench dropped out of the employee's tool belt and struck Laise in the head. (Def. SOF. ¶7).

The falling wrench broke Laise's nose and lacerated his face. Id. at ¶ 8. Because of his injuries, Laise was taken by ambulance to Valley Hospital where he was treated by Dr. Tuckman, a plastic surgeon. (Pl. Ex. 13). Due to ongoing problems, Laise later underwent a second surgery related to his injuries on January 25, 2007. (Pl. Ex. 16). Burlington was informed about the incident through a letter from ACE Insurance Company on behalf of its insured, Weir, which sought indemnification from Stonebridge and coverage as an additional insured under the Burlington policy. (Def. SOF. ¶ 10).

On September 18, 2007, Laise filed suit against Stonebridge, alleging that because of the negligence of its employee, he had suffered an open comminuted displaced nasal fracture, deviated nasal fracture, nasal laceration, nasoseptal deformity, hypertrophy of bilateral inferior turbinates, sinusitis, headaches and anosmia. (Pl. Exs. 7,8). Burlington was provided with a copy of the complaint by plaintiff's counsel under cover of letters dated September 25, 2007 and October 3, 2007. (Def. SOF. ¶ 11).

Burlington agreed to defend Stonebridge, and Stonebridge's defense was referred to the Law Offices of John C. Lane on October 30, 2007. (Pl. Ex. 24). While Burlington was aware of the role of the truck in the accident, it did not learn the identity of the truck's owner or insurer until September of 2008. (Pl. Ex. 18, 14:3-8). On October 1, 2008, Burlington's counsel sent a letter to Northland attaching the Laise complaint and Stonebridge answer. The letter also stated that:

> Further investigation with the FMCA Motor Carrier website has identified Northland Insurance Company as Kepler Brothers' insurer at the time of the accident. The policy was identified as TF480923, with an effective policy date of September 15, 2005 through January 4, 2007. It is our position that the Northland Insurance policy likely provides primary insurance to this accident under the loading/unloading provisions of its liability insurance policy. We, therefore, demand that Northland Insurance Company immediately provide us with a copy of the policy and indemnify my client, Stonebridge, Inc. in this action.

> (Pl. Ex. 26).

A week later, on October 8, 2008, a Northland representative, Rick Kalustian, responded to Burlington's letter by email. He replied:

> Northland has received your 10/1 claim letter regarding this lawsuit. While we have not yet had an opportunity to retrieve and analyze our insured's policy, I'm writing you at this early juncture to hopefully get a better understanding why you believe such a policy would provide a defense and indemnity to your client Stonebridge.

> (Pl. Ex. 28).

On January 30, 2009, Stonebridge counsel contacted Northland by telephone, again requesting a copy of the Northland insurance policy so that the "loading/unloading" provisions could be examined. (Pl. Ex. 27). The policy was eventually sent to Stonebridge on February 2, 2009. (Pl. Ex. 30).

On February 3, 2009, the Laise action was submitted to mandatory, non-binding arbitration pursuant to New Jersey Superior Court rules. The arbitration resulted in a finding of

100% liability upon Stonebridge with a damages award of $175,000. (Pl. Ex. 19). On February 18, 2009, Stonebridge counsel contacted Northland again and requested that they take over the defense and indemnification of the <u>Laise</u> case. (Pl. Ex. 27).

What happened next is disputed. The notes from Northland's employee indicate that a letter was sent to Burlington advising them that Northland had been unable to determine if it owed a defense or indemnification to Stonebridge and requesting "arb hearing docs/case docs including depo transcripts." <u>Id</u>. However Stonebridge counsel did not recall receiving any letter, and no copy of such a letter has been offered into evidence. Stonebridge counsel testified at deposition that he spoke to the Northland employee on the telephone and advised her of the results of the arbitration hearing. (Pl. Ex. 18, 62-63). He did not recall and indeed doubted that Northland had requested discovery information or that he had agreed to provide such information to Northland. <u>Id</u>.

On February 24, 2009, the <u>Laise</u> plaintiffs filed a notice of demand for a trial de novo. (Pl. Ex. 20). A month later on May 15, 2009 Burlington wrote again to Northland advising them of the upcoming trial date. The letter also stated:

> As you should be aware, TBIC has tendered this matter to you on behalf of our insured given Stonebridge's entitlement to coverage under the above automobile liability policy issued to Kepler Brothers Inc. (Kepler)… The only response we have received to date is that the matter is "under review." You have not requested any additional information from us… We again invite Northland Insurance (Northland) to participate in the defense and/or settlement negotiations in this matter.
>
> (Pl. Ex. 31).

Northland replied on May 18, 2009. While acknowledging receipt of Burlington's letter, Northland claimed to have "limited information regarding this loss" and further stated that it had been "unable to determine if [it] owe[d] a defense regarding [the] case." (Pl. Ex. 32). Northland

also claimed to be waiting for "documents regarding the arbitration proceeding" and requested "all deposition transcripts related to this case." <u>Id</u>. On May 22, 2009, Burlington sent Northland the requested deposition transcripts. (Pl. Ex. 33). One week later, on May 29, 2009, Burlington and Stonebridge filed this action in New Jersey Superior Court.

On June 15, 2009, the day that trial was scheduled to begin, Burlington, on behalf of Stonebridge, settled the <u>Laise</u> action for $325,000. (Pl. Ex. 23). The order of dismissal included a comment that "[a]fter conferencing this matter, reviewing liability and damages issues, Judge Ciuffani recommended settlement at $325,000, which was ultimately agreed to between the parties." <u>Id</u>. Burlington subsequently paid the entire $325,000. (Pl. Ex. 39). In addition, the net defense costs and fees paid by Burlington on behalf of Stonebridge from the date of tender through the filing of a stipulation of dismissal totals $13,337.42. (Pl. Exs. 39, 40, 41).

This case was removed to federal court on diversity grounds on July 1, 2009 pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1446(b). Plaintiffs claim that Northland owes primary coverage and defense costs relating to the <u>Laise</u> action. Plaintiffs seek a declaratory judgment and reimbursement for the expenses incurred by Burlington in defending and settling the <u>Laise</u> matter. Plaintiffs also seek costs incurred in prosecuting this action.

The Northland policy provides in pertinent part:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

The Northland policy defines "insured" as follows:

> 1. Who Is An Insured
> The following are "insureds":
> a. You for any covered "auto".
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

* * *
(4) Anyone other than your "employees", partners (if you are a partnership),
members (if you are a limited liability company), a lessee or borrower of a
covered "auto" or any of their "employees", while moving property to or from a
covered "auto".

The Northland policy also contains the following exclusions:

B. Exclusions

This insurance does not apply to any of the following:
* * *
4. Employee Indemnification and Employer's Liability
"Bodily injury" to:
a. An "employee" of the "insured" arising out of and in the course of:
(1) Employment by the "insured"; or
(2) Performing the duties related to the conduct of the "insured's" business

* * *
8. Movement of Property By Mechanical Device
"Bodily injury" or "property damage" resulting from the movement of property
by a mechanical device (other than a hand truck) unless the device is attached to
the covered "auto".

On the basis of these facts, all parties now move for summary judgment.

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a). For an issue to

be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find

for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a

fact to be material, it must have the ability to "affect the outcome of the suit under governing

law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact and do not merely suggest "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

In this case the facts are largely uncontested and what lies before the Court are almost entirely issues of law. As such, summary judgment on all contested issues is appropriate. See American Cas. Co. of Reading, Pennsylvania v. Continisio, 819 F.Supp. 385, 396 (D.N.J. 1993) ("The interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary judgment.").

**B.   Choice-of-Law**

The first disputed issue is whether the law of New Jersey or Pennsylvania governs its analysis of the scope of coverage under the Northland policy. Defendant argues that Pennsylvania law should govern because, *inter alia*, the policy was "issued in Pennsylvania to a Pennsylvania entity in conformance with and reliance on Pennsylvania's insurance laws and regulations" and "the policy covered vehicles registered and principally garaged in Pennsylvania that were driven by Pennsylvania residents who maintained Pennsylvania driver's [sic] licenses" and moreover that "the injured party was a Pennsylvania resident who was treated in Pennsylvania and received workers compensation benefits there." (Def. Br. 14).

Plaintiffs reply that coverage in this action arises not because of the terms of the contract itself, but rather due to the application of New Jersey's "deemer" statute (N.J.S.A. 17:28-1.4), which mandates certain minimum coverage for any insurer transacting business in the state. (Pl. Op. Br. 6). Plaintiffs argue that construction of the New Jersey statute is appropriately done in accordance with New Jersey law.

The Court of Appeals described the New Jersey choice-of-law procedure for contract disputes in the recent <u>Forestal Guarani S.A. v. Daros Intern., Inc.,</u> decision, writing that:

> In making a choice-of-law determination in a breach-of-contract case, New Jersey courts ask which forum has the most significant relationship with the parties and the contract... To that end, the New Jersey Supreme Court has adopted the principles set forth in § 188 and § 6 of the Restatement (Second) of Conflicts of Laws. Section 188 directs courts to consider, among other things:
>
> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
>
> Section 6 lists the following nonexclusive factors relevant to a choice-of-law analysis:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

> 613 F.3d 395, 401 (3d Cir. 2010) (internal citations omitted).

It is clear in this case that the traditional choice-of-law analysis heavily favors the application of Pennsylvania law. The contract in question was entered into by Pennsylvania entities who could reasonably have expected to see its terms analyzed in accordance with Pennsylvania law. Moreover, Pennsylvania was clearly the principal location of the insured risk. See Restatement (Second) of Conflicts of Laws § 193 ("The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.").

However it has been consistently held that New Jersey law applies to cases brought on the basis of the "deemer" statute.  See Hamilton v. Government Employees Ins. Co., 283 N.J. Super 424, 429 (App. Div. 1995) ("When N.J.S.A. 17:28-1.4 applies, there is no choice-of-law issue"); D'Orio v. West Jersey Health Systems, 797 F.Supp. 371, 373 -374 (D.N.J. 1992) ("Section 1.4 creates a cause of action for an out-of-state resident injured in a New Jersey automobile accident against his own liability insurer… provided the insurer does business in New Jersey. This cause of action exists notwithstanding that such benefits may not be actually included (other than by the metaphysical act of "deeming") in the terms of a policy otherwise

issued in conformity with the state of the insured's residence"); <u>Adams v. Keystone Ins. Co.</u>, 264

N.J. Super 367, 374 (App. Div. 1993) (same).

     Indeed, it would hardly seem sensible to look to Pennsylvania law to determine the scope

of minimum insurance protection mandated by the New Jersey deemer statute. That statute

provides, in pertinent part that:

> any insurer authorized to transact or transacting automobile or motor vehicle
> insurance business in this State,… which sells a policy providing automobile or
> motor vehicle liability insurance coverage, or any similar coverage, in any other
> state… shall include in each policy coverage to satisfy at least the liability
> insurance requirements of subsection a. of [N.J.S.A. 39:6B-1] or section 3 of
> [N.J.S.A. 39:6A-3]… whenever the automobile or motor vehicle insured under
> the policy is used or operated in this State.
>
>     \* \* \*
>
> Any liability insurance policy subject to this section shall be construed as
> providing the coverage required herein…
>
> N.J.S.A. 17:28-1.4

The minimum coverage referenced in the statute is set forth in N.J.S.A. 39:6B-1, and includes

"loss resulting from liability imposed by law for bodily injury… sustained by any person arising

out of the ownership, maintenance, operation or use of a motor vehicle wherein such coverage

shall be at least in: (1) an amount or limit of $15,000.00, exclusive of interest and costs, on

account of injury to…one person, in any one accident. . . "

     As described in more detail below, the <u>Laise</u> accident occurred while the vehicle was "in

use" as that term is interpreted under the laws of New Jersey. Consequently, N.J.S.A. 17:28-1.4

applies and the Northland contract must be read to include the primary coverage mandated by

N.J.S.A. 39:6B-1. Indeed, as Plaintiffs' claims would be prohibited by the various exclusions of

the Northland policy—whether analyzed under either New Jersey or Pennsylvania contract

construction principles—they arise entirely under the mandatory provisions of N.J.S.A. 39:6B-1.

As such, New Jersey law applies to all portions of the contract mandated by operation of the New Jersey deemer statute.[1]

###  C.     "Use" Of Motor Vehicle

The second contested issue is whether the accident in <u>Laise</u> was one "arising out of the… use of a motor vehicle." N.J.S.A. 39:6B-1. The New Jersey Supreme Court last considered the meaning of that phrase in <u>Penn Nat. Ins. Co. v. Costa</u>, 198 N.J. 229, 237 (N.J. 2009) where it wrote:

> the phrase "arising out of" must be interpreted in a broad and comprehensive sense to mean "originating from" or "growing out of" the use of the automobile. So interpreted, there need be shown only a substantial nexus between the injury and the use of the vehicle in order for the obligation to provide coverage to arise. The inquiry should be whether the negligent act which caused the injury, although not foreseen or expected, was in the contemplation of the parties to the insurance contract a natural and reasonable incident or consequence of the use of the automobile, and thus a risk against which they might reasonably expect those insured under the policy would be protected. Whether the requisite connection or degree of relationship exists depends upon the circumstances of the particular case.

> <u>Penn Nat.</u>, 198 N.J. at 237.

Generally, a person injured in the process of unloading cargo from a vehicle is considered a user of the vehicle and entitled to coverage under an automobile policy because of the "substantial nexus between the injury and the use of the vehicle." <u>Bellafronte v. Gen. Motors Corp.</u>, 151 N.J. Super 377, 382-83 (App. Div. 1977). However this is not a mechanical rule. In particular, accidents that are the result of preexisting unsafe conditions unrelated to the unloading itself will not give rise to coverage under an auto insurance policy simply because they occur during an unloading. <u>Wakefern Food Corp. v. General Acc. Group</u>, 188 N.J. Super 77, 84 (App. Div. 1983) ("unless the alleged negligent act which is alleged to have caused the accident was an

---

[1]     To the extent that original portions of the contract are not superseded by statute, they should be interpreted according to Pennsylvania law. However the Court has no occasion to do so here.

integral part of the overall loading or unloading operation, so that the mishap is causally connected with such loading and unloading *and did not merely occur during it,* the person charged with the negligent act is not considered to have been using the vehicle so as to be covered by the vehicle's liability policy for such act as an additional assured."); <u>see also</u> <u>Halifko v. Cities Service Oil Co.</u>, 510 F.Supp. 1131, 1136 (D.N.J. 1981) ("Sound policy considerations weigh strongly against construing an omnibus clause to cover the owner of a loading platform on which a named insured is injured solely due to an unsafe condition on the premises.").[2] <u>aff'd</u>. 676 F. 2d 685 (3d Cir. 1982).

In this case the accident was caused by a Stonebridge employee dropping a wrench from the back of a truck that he was in the process of unloading. The employee had climbed on top of the truck (with the offending wrench) for the sole purpose of unloading the cargo. The injured party was struck while he assisted in unloading the truck. As such, the cause of the injury was negligence by the Stonebridge employee in unloading the covered vehicle, and not any preexisting condition at the worksite. The accident thereby arises out of the use of a motor vehicle for the purposes of the deemer statute.

Defendant contends that the true cause of the injury was "an unsecured wrench" which represented an "external force" unrelated to the unloading of the truck. (Def. Br. 18).  Defendant strains to characterize the wrench as a preexisting condition of an "unsafe worksite." <u>Id</u>. But even if the wrench were unsecured before the employee climbed on to the truck, it posed little or

---

[2]      <u>Compare</u> <u>also</u> <u>Parkway Iron & Metal Co. v. New Jersey Mfrs. Ins. Co.</u>, 266 N.J. Super 386, 388-390 (App. Div. 1993) (negligent use of a crane in unloading constituted "use" of automobile); <u>Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Corp., Inc.</u>, 119 N.J. 402, 409 (1990) (negligent use of forklift constituted "use" of vehicle) <u>with</u> <u>Neuman v. Wakefern Foods</u>, 205 N.J. Super 263, 266 (App. Div. 1985) (failure to maintain unloading equipment did not constitute "use" of automobile); <u>Forsythe v. Teledyne Turner Tube</u>, 209 N.J. Super 608, 616 (App. Div. 1986) (failure to maintain dock loading plate did not constitute "use" of vehicle.").

no danger until carried to great height.[3] If the wrench had fallen while the employee was standing on the ground it could not have caused injuries of the nature or severity of those suffered by Plaintiff Laise. Indeed, it might not have caused any injuries at all. In addition, the wrench fell only after the employee bent over to retrieve a fallen choker, an intervening act of negligence that directly occasioned the accident.

Defendant further claims that the wrench was not a necessary tool for the unloading of the vehicle, (Def. Op. Br. 14) a fact that Plaintiff vigorously contests (Pl. SOF. ¶¶ 24-25). However, whether or not the wrench was actually used in unloading the vehicle is irrelevant. The Stonebridge employee dropped a tool while unloading the truck. If the heavy and potentially dangerous tool[4] was one carried on to the truck without any reason, that was itself a negligent act directly connected to the unloading of the truck.

As such, no matter why the wrench was brought on top of the truck, the injuries suffered by Laise had a "substantial nexus" to the use of the vehicle. As such, they arose out of the use of a motor vehicle for the purpose of the New Jersey deemer statute.

### D. Applicability Of Policy Exclusions

A third issue contested by the parties is the effect of disclaimer language in the Northland policy. There are several exclusions that would seem to preclude liability. The first is the limitation on the scope of insureds under the policy. The policy provides that insurance does not extend to "[a]nyone other than your 'employees', partners (if you are in a partnership), members (if you are a limited liability company), a lessee or borrower of the covered 'auto' or any of their 'employees', while moving property to and from a covered 'auto'." Northland Policy

---

[3]     Mr. Laise testified that the wrench was approximately thirteen and a half feet in the air when it fell from the Stonebridge employee's belt. (Pl. Ex. 5, 26:19-21).

[4]     Mr. Laise testified that the spud wrench was between 16 and 18 inches long. (Pl. Ex. 5, 27:2-9).

§ II(A)(1)(b)(4). The second exclusion applies to bodily injury to employees. The Northland policy explicitly disclaims coverage for "'[b]odily [i]njury' to: [a]n employee of the 'insured' arising out of and in the course of: (1) [e]mployment by the 'insured'; or (2) [p]erforming the duties related to the conduct of the 'insured's' business." Id. § II§ (B)(4)(a). The third exclusion disclaims coverage for injuries sustained from "the movement of property by mechanical device (other than hand truck) unless the device is attached to the covered 'auto'." Id. § II(B)(8).

Defendant admits that these disclaimers have been found to violate New Jersey's financial responsibility statute. (Pl. Br. 24, 27). Defendant argues half-heartedly that since the disclaimers are valid under Pennsylvania law, the Court should apply them here. But as stated above, Plaintiffs' claims arise under the New Jersey statute and are not predicated on the language of the Northland policy. To the extent that the Northland policy seeks to disclaim coverage that is required under N.J.S.A. 39:6B-1, it is void. As such, the exemptions and disclaimers do not prohibit coverage here.

### E.    Limits of Coverage

A fourth issue contested by the parties is the amount of coverage available from Northland as a function of N.J.S.A. 39:6B-1. Plaintiffs argue that the full policy limit applies in the absence of a "step down" provision in the policy. (Pl. Br. 15). Plaintiffs note that Defendant's employees have admitted that no such step-down provision exists in this policy. (Pl. Br. 18). Defendant argues that in the event that N.J.S.A. 39:6B-1 is held to apply, that it should mandate only the minimum coverage required by the statute ($15,000) and should not require any additional coverage. (Def. Br. 27).

Potenzone v. Annin Flag Company, 191 N.J. 147 (N.J. 2007) controls here. In Potenzone, the New Jersey Supreme Court addressed this precise issue—whether mandatory coverage

incorporated by the deemer statute mandates minimum coverage or provides for coverage up to the full policy limits. Potenzone also involved a personal injury case arising out of a loading accident. The operative auto insurance policy contained an exclusion substantially identical to the exclusion in this case, which disclaimed coverage for non-employees during loading and unloading operations. The Court in Potenzone held that the exclusion was "unenforceable" and that "[a]bsent the invalid loading and unloading clause, the remaining portions of the policy are applicable as written" Id. at 154-155.

The court then examined whether the coverage available would be limited to the $15,000 minimum or whether the full coverage amount available under the policy would be available. While recognizing that a prior decision in Proformance Insurance Co. v. Jones[5] might suggest that only minimum coverage was required, the court elected to mandate the opposite, noting that:

> We choose a different path here. Following our decision in *Ryder,* insureds, insurers, and self-insurers should have reasonably expected that the full policy limit for an accident during a loading or unloading operation was required. As stated earlier, the insurance industry has had ample time to adjust its rates and policy terms. *Ryder, supra,* 119 *N.J.* at 413, 575 *A.*2d 416 ("Under the terms of an ordinary liability policy, an insurer would be required to provide coverage in a loading and unloading accident to the limits of its policy-often an amount greater than the statutory minimum." (Internal quotation marks omitted)). If the insurer intended to provide the statutory minimum coverage for loading or unloading accidents, it should have amended its policy to expressly provide for such step-down coverage. The failure to plainly provide for any step-down amounts results in the application of the full policy limits.

> Id. at 155-156

Defendant attempts to distinguish Potenzone by arguing that unlike the Potenzone insurer, it is based in Pennsylvania and could not have been expected to be familiar with New Jersey insurance regulations. Defendant claims that Potenzone instead involved a New Jersey

---

[5]   185 N.J. 406 (2005).

insurer that argued for minimum coverage after attempting to apply an invalid exclusion. (Def. Br. 31).

But this is both irrelevant and incorrect. At its heart, Potenzone involved a dispute between Pennsylvania National Mutual Casualty Insurance ("Penn National") and Atlantic Mutual Insurance Company ("Atlantic"). Atlantic was indeed an insurance company based in New Jersey. However the question before the court in Potenzone was whether Penn National—a Pennsylvania insurer like Northland—would be obligated to provide coverage up to its full policy limits or merely the state minimum coverage. Potenzone, 191 N.J. at 150-151 ("The sole issue on appeal was whether *Penn National's* insurance coverage should be limited to the statutory minimum or extended to the face amount of the policy") (emphasis added).  The New Jersey Supreme Court ruled that Penn National was obligated to pay the full face value of the policy in spite of where it was located, not because of it.

Defendant also argues that it would be "inequitable" to apply "case-specific reasoning" from Potenzone to this action because Potenzone was decided after the Northland policy was issued. (Def. Br. 32). This argument fails on numerous grounds. First, in New Jersey "retroactive application of judicial decision is the general rule" and nothing in the Potenzone decision suggests intent to deviate from that rule. Green v. Auerbach Chevrolet Corp., 127 N.J. 591, 600 (1992) (affirming general rule and making intent to deviate explicit).[6] Second, the court in Potenzone made it clear that the decision was in accord with its previous holding in Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Corp., 119 N.J. 402 (N.J. 1990). Indeed the Potenzone court

---

[6] See also Accountemps Div. of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd., 115 N.J. 614, 627 (N.J. 1989) (New Jersey Supreme Court specifically stated that its holding was to be given only prospective effect).

specifically stated that "the insurance industry has had ample time to adjust its rates and policy terms" to reflect the Ryder holding. Potenzone, 191 N.J. at 155.

Northland is an insurer permitted to operate in New Jersey. It is required to abide by and should be familiar with all applicable New Jersey insurance regulations. Defendant's arguments to the contrary are unavailing. The decision from Potenzone is controlling, and Northland owes primary coverage and a defense to Stonebridge up to the face value of the Northland policy.[7]

**F.      Reasonableness of Settlement**

The parties also contest whether the June 15, 2009 settlement of the Laise matter was reasonable. Plaintiffs claim that the settlement amount was recommended by Judge Ciufani and was—in fact—significantly lower than verdicts in other similar cases that trial counsel uncovered during a verdict search. (Pl. Br. 29-30). Defendant claims that the settlement was made for an "unreasonable amount" and entered into through "collusion and bad faith"— collusion that apparently involved Judge Ciufani. (Def. Br. 39).

The law is clear that "[w]here an insurer [has] wrongfully refused coverage and a defense to its insured, so that the insured is obliged to defend himself in an action later held to be covered by the policy, the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him" and that "[t]he only qualifications to this rule are that the amount paid in settlement be reasonable and that the payment be made in good faith." Griggs v. Bertram,

---

[7]      The Burlington Policy is, by its terms, excess over any other insurance that covers a loss that "arises out of the maintenance or use of… 'autos…'" Burlington Policy § IV(4)(b)(1)(c). The Northland general liability policy contains no such "other insurance" clause with respect to bodily injury. Since there is no conflict, we apply the policies as written. Universal Underwriters Ins. Co. v. CNA Ins. Co., 308 N.J. Super 415, 420 (App. Div. 1998) ("the liability of insurers under overlapping coverage policies is to be governed by the intent of the insurers as manifested by the terms of the policies which they have issued. Thus, it has been said that where two or more liability policies overlap and cover the same risk and the same accident, the respective liabilities of the insurers must rest upon a construction of the language employed by the respective insurers.") quoting 16 Couch on Ins. § 62.44 (2d Rev. Ed.1983).

88 N.J. 347, 364 (1982) quoting Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford, 72 N.J.

63, 71 (1976). In determining whether a settlement was made in good faith, New Jersey requires

that an insured bear the initial burden of producing "the basic facts relating to the settlement"

which demonstrate "the operative evidential facts as to its reasonableness and good faith…" Id.

at 367. The insured must show that the settlement is "by the initial production of proof to be

prima facie reasonable in amount and untainted by bad faith. . ." Id.  In short, "[t]he *Griggs*

standard does not call for 100% accuracy, but only that in light of all of the relevant facts and

upon a reasonable inquiry, the insured agreed to a settlement amount that was reasonable and

entered into in good faith." Excelsior Ins. Co. v. Pennsbury Pain Center, 975 F.Supp. 342,

57 (D.N.J. 1996).

Once an insured has produced the relevant details of the settlement, the burden shifts onto

the insurer, who is "required to sustain the ultimate and major burden of demonstrating, by a

preponderance of the evidence, that it is not liable because the settlement is neither reasonable

nor reached in good faith." Griggs, 88 N.J. at 367.

Here Plaintiffs have introduced significant evidence concerning the nature of the claims,

the investigation by trial counsel, and the efforts made to appropriately price the settlement.

Plaintiffs have introduced sworn statements concerning the extent of Laise's injuries (Pl. Ex. 8),

the Valley Hospital Medical chart detailing Laise's injuries (Pl. Ex. 13), the report of Dr.

Oberhand, who examined Laise (Pl. Ex. 14), the report of Dr. Stephen Freifeld, an independent

doctor hired by Stonebridge to examine Laise (Pl. Ex. 17), the deposition testimony of

Stonebridge's counsel Peter Bobchin, who testified concerning his assessment of the medical

reports, their impact on the viability of Laise's claims, and the Laise plaintiff's pre-arbitration

and pre-trial demands of $500,000 and $750,000 respectively (Pl. Ex. 18), a pre-trial report

submitted by Bobchin in which he estimated that a jury could award a verdict "in the $300,000 range or more" (Pl. Ex. 21), and the results of a "verdict search" by a third party vendor which uncovered verdicts of $4,700,000 and $5,200,000 (Pl. Ex. 22). Plaintiffs have also introduced evidence of the difficulty in appropriately pricing an anosmia claim, noting that Defendant's own price adjusters could not recall handling such a claim in the past (Pl. Exs. 2, 38).

This documentation more than satisfies Plaintiffs' burden of producing evidence sufficient to "apprise the insurer of the nature of the insured's claim and… remove speculation or guess work as to what will be material in terms of the reasonableness and fairness of the settlement." Griggs, 88 N.J. at 367. Plaintiffs have provided extensive information concerning the nature of the injuries giving rise to the insured's claim, the efforts made by counsel to evaluate and quantify the claim, and the history of the negotiation between the parties concerning the settlement. Having made out a prima facie case, it is Defendant's obligation to prove, by a preponderance of the evidence, that the settlement was "unreasonable" and entered into "in bad faith." Griggs, 88 N.J. at 367.

Defendant points to five pieces of evidence to demonstrate that the Laise settlement is unreasonable. The first is the non-binding arbitration award of $175,000 entered on February 3, 2009. (Def. Ex. Y). The second is a letter from trial counsel Bobchin in which he related the results of the arbitration and indicated that he "told the arbitrator that [he] disagreed with plaintiff's assessment of the value, and estimated an amount in the low five figures." (Def. Ex. DD). The third is the deposition testimony of Burlington employee John Keizer, who states that Burlington's initial reserve for the claim was $25,000, which was later increased to $250,000 (Def. Ex. EE). The fourth is a number of New Jersey settlements concerning face injuries and/or anosmia that involved payments of significantly less than $325,000. (Def. Ex. MM). In addition,

Defendant points to the fact that trial counsel Borchin included Judge Ciufani's finding that the settlement was reasonable in the settlement order as evidence of "collusion and bad faith." (Def. Br. 39). Borchin testified that he included the language at the Judge's direction. (Def. Ex. U).

This evidence does not suffice to meet Defendant's heavy burden to prove by a preponderance of the evidence that the settlement is "unreasonable" and the product of "bad faith and collusion." At best, the evidence demonstrates that Plaintiffs initially hoped to settle the case for a small amount of money, forcefully advocated that position to the arbitrator, and then revised their settlement numbers upward in the face of an adverse arbitration award, potentially catastrophic jury verdicts and and unwillingness by the <u>Laise</u> plaintiff to back down from high demands. While the three anosmia cases cited by Defendant settled for smaller sums ($125,000, $150,000, and $150,000), those settlements and stipulations of damages do not by themselves demonstrate the unreasonableness of the <u>Laise</u> settlement, particularly given the mixed fault issues presented in the case summaries and the scarcity of the factual record with respect to the underlying claims. Nor is much weight to be accorded to the accusation—made without any evidence—that Judge Ciufani was somehow complicit in, or influenced by, collusion between Borchin and the <u>Laise</u> plaintiffs to "settle[] the case for an unreasonable amount based upon [their] expectation that [they] could shift the financial burden to Northland…" (Def. Br. 39).

Defendant having failed to meet its burden, its challenge to the reasonableness of the settlement fails. Northland is liable for the full $325,000 <u>Laise</u> settlement.

G.    **Defense Costs**

The parties also contest the availability of defense costs. Defendant argues that the notice provided to it by Plaintiffs was defective and that it was not adequately informed about the potential for coverage under its policy until this instant action was filed. (Def. Reply Br. 28).

Indeed, Defendant contends that even after discovery, it has not received evidence sufficient to trigger a duty to defend. Id. at note 8.

Defendant is mistaken. It is black letter law that a "the duty to defend comes into being when the complaint states a claim constituting a risk insured against." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173 (N.J. 1992). An insured need not offer conclusive evidence of liability to be entitled to a defense. Rather "[w]hether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy" (Id.) together with such extrinsic facts demonstrating coverage that are "properly and promptly" conveyed by the insured. SL Industries, Inc. v. American Motorists Ins. Co., 128 N.J. 188, 199-200 (N.J. 1992).  Moreover, "any fair doubt with regard to whether any of the allegations of the complaint may fit within policy coverage should be resolved in favor of the insured." Mt. Hope Inn v. Travelers Indem. Co., 157 N.J. Super 431, 441 (Law Div. 1978).

Defendant was provided with a copy of the complaint on October 8, 2008. That complaint stated that plaintiff Laise was a Kepler employee who was injured while delivering his load of steel to the Garden State Plaza. (Pl. Ex. 7 ¶ 1). The complaint further stated that the accident occurred when an unidentified worker climbed onto Laise's truck and dropped a wrench on his face. Id. at ¶ 2. At the same time Northland was notified that "[f]urther investigation with the FMCA Motor Carrier website has identified Northland Insurance Company as Kepler Brothers' insurer at the time of the accident" with policy no. "TF480923" that was effective "September 15, 2005 through January 4, 2007." (Pl. Ex. 26). It was further notified that "Northland Insurance policy likely provides primary insurance to this accident under the loading/unloading provisions of its liability insurance policy." Id.

Defendant argues that because one of its employees sent an email message stating "I'm writing you at this early juncture to hopefully get a better understanding why you believe such a policy would provide a defense and indemnity to your client Stonebridge", (Pl. Ex. 28) it was entitled to ignore repeated requests from Stonebridge counsel that it take over the defense of the Laise case until supporting evidence was received.[8]  This argument is unpersuasive. While "[u]pon the receipt from its insured of a claim or notification of an incident that may give rise to a claim, an insurer is entitled to a reasonable period of time in which to investigate whether the particular incident involves a risk covered by the terms of the policy" (Griggs v. Bertram, 88 N.J. at 357), an insurer may not "simply hire counsel, bury its head in the sand, pay when ordered to do so, retain the use of the insured's money in the meantime, and escape without adverse consequences." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 234 (3d Cir. 1997). Indeed, Defendant's employee Richard Kalustian was unable to articulate in his deposition what information he wanted the Stonebridge's attorney to provide. (Pl. Ex. 38). Moreover, within a month of receiving Borchin's letter, Defendant had gathered additional pertinent facts about the claim, including the insurance policy and a description of the incident from Kay Kern. (Pl. Ex. 27).

On the basis of the information provided to it on October 8, 2009, Defendant could have properly concluded that it owed coverage and a defense under the terms of New Jersey's deemer

---

[8]      It is unclear how Northland expected Stonebridge counsel to conclusively demonstrate coverage without a copy of the policy, which it took over four months to provide. (Pl. Ex. 30). Moreover, despite repeated requests for defense and indemnity, there is no clear evidence that Northland made any further request for information before May 18, 2009. (Pl. Ex. 32). Northland cites to notes from one of its employees that a letter was sent to Stonebridge counsel around February 18, 2009, (Pl. Ex. 27) but no copies of the letter have been offered into evidence, and Plaintiffs' trial counsel contests that it was sent. (Pl. Ex. 18) Regardless of whether—as the record suggests—Northland acted in bad faith in refusing to provide or disclaim coverage, Defendant was properly notified of the Laise claim on October 8, 2009 and is responsible for all defense costs from that day forward.

statute. Defendant was properly notified of the <u>Laise</u> claim on October 8, 2009 and is responsible for defense costs from that day forward.

### H.    Costs of Current Motion

Plaintiff Burlington also seeks fees and costs related to bringing the instant declaratory judgment action as permitted under New Jersey Court Rules. [9] Defendant argues that a fee award would be improper because "[p]laintiffs' conduct necessitated this litigation on the policies" and "plaintiffs delayed in notifying Northland of the claim, failed to provide documentation to support the claim for coverage, failed to provide details regarding the status of the underlying litigation, and provided only limited discovery virtually on the eve of trial of the underlying litigation." (Def. Op. Br. 31).

New Jersey Court Rule 4:42-9(a)(6) allows a party to recover attorney fees "[i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." These fees are "not mandatory in every action on an indemnity or liability policy" but are instead subject to the trial judge's "broad discretion as to when, where and under what circumstances counsel fees may be proper." <u>Enright v. Lubow</u>, 215 N.J. Super 306, 313 (App. Div. 1987). In making an award, the court may consider:

> (1) the insurer's good faith in refusing to pay the demands;
> (2) excessiveness of plaintiff's demands;
> (3) bona fides of one or both of the parties[;]
> (4) the insurer's justification in litigating the issue;
> (5) the insured's conduct in contributing substantially to the necessity for the litigation on the policies[;] and
> (7) the totality of the circumstances

> <u>Id</u>. (internal citations omitted).

---

[9]    The Court of Appeals has noted that "[s]tate rules concerning the award or denial of attorneys' fees are to be applied in cases where federal jurisdiction is based on diversity ... provided such rules do not run counter to federal statutes or policy considerations." <u>McAdam v. Dean Witter Reynolds, Inc.</u>, 896 F.2d 750, 775 n. 46 (3d Cir. 1990).

The New Jersey Supreme Court has noted that "[t]he policy underlying *Rule* 4:42-9(a)(6) is 'to discourage groundless disclaimers and to provide more equitably to an insured the benefits of the insurance contract without the necessity of obtaining a judicial determination that the insured, in fact, is entitled to such protection.'" Sears Mortg. Corp. v. Rose, 134 N.J. 326, 356 (1993) quoting Guarantee Ins. v. Saltman, 217 N.J. Super 604, 610 (App. Div. 1987). However, a plaintiff need not show that an insurer acted in "bad faith" to recover. Id; see also Baughman v. U.S. Liability Ins. Co., 723 F.Supp.2d 741, 747 (D.N.J. 2010) ("The insurer's lack of bad faith will not preclude the discretionary allowance of a fee") quoting PRESSLER, Current New Jersey Court Rules, Comment R. 4:42-9(a)(6) (2005).

In this case, Northland has taken every possible measure to avoid providing coverage. It has ignored repeated requests for defense and indemnity for months at a time, hoping that "[m]aybe [Plaintiffs] will go away…" (Pl. Ex. 29). It has provided Plaintiffs with basic coverage documents only after months of delay and repeated requests. (Pl. Ex. 30). Even after this declaratory action was filed, Defendant did not bother to make a coverage determination, deciding instead to "let the courts decide" if coverage was owed. (Pl. Ex. 38, 4:16).  Rule 4:42-9(a)(6) exists precisely to discourage this sort of behavior and provide an incentive for insurance companies to honor their legal obligations "without the necessity of obtaining a judicial determination" first. Sears, 134 N.J. at 356.

Consequently this Court awards attorneys fees to Burlington for the costs associated with the instant motion.

### III. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is GRANTED. Defendant's motion is DENIED. Northland policy no. TF480923 provides primary liability

coverage for Stonebridge for the <u>Laise</u> action and Northland owes defense and indemnification to Stonebridge for that action. Northland shall reimburse Burlington in the amount of $338,377.42, which sum is comprised of $325,000 paid by Burlington for indemnification of Stonebridge in the <u>Laise</u> action and $13,377.42 for defense fees, costs, and expenses from the date of tender until resolution of that case, together with prejudgment interest. Northland shall also reimburse Burlington for any and all costs and fees incurred in bringing this declaratory judgment action pursuant to New Jersey Court Rule 4:42-9(a)(6). Plaintiffs shall supply the Court with a certification of fees and costs related to this declaratory judgment action within two weeks of the date hereof.

<u>s/ Dickinson R. Debevoise</u>
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: February 3rd, 2011